UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MIRTHA LORENZO and IRENE RIVERA,

             Plaintiffs,

       - against -

ST. LUKE'S-ROOSEVELT HOSPITAL
CENTER,

             Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

<u>MEMORANDUM AND
ORDER</u>
09-CV-2277 (JG)(JO)

A P P E A R A N C E S:

      ROOSEVELT T. SEYMOUR
          162 Montague Street, Suite 201
          Brooklyn, NY 11201
          *Attorney for Plaintiffs*

      LITTLER MENDELSON, P.C.
          900 Third Avenue
          New York, NY 10022
      By:   Barbara Gross
           Elias Jay Kahn
          *Attorneys for Defendant*

JOHN GLEESON, United States District Judge:

      Mirtha Lorenzo and Irene Rivera allege age-based discrimination against their

employer, St. Luke's-Roosevelt Hospital Center (the "Hospital"), in violation of the Age

Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the New

York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 296, *et seq.* Lorenzo also alleges

that the Hospital retaliated against her for complaining of discrimination, in violation of Title VII

of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* and the NYSHRL. The

Hospital has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil

Procedure. I hereby grant summary judgment to the Hospital on both plaintiffs' age

discrimination claims. I deny summary judgment on Lorenzo's retaliation claim.

BACKGROUND

A.    *Mirtha Lorenzo*

1.    *Work History and Job Description*

Mirtha Lorenzo, now 61 years old, was hired by the Hospital in 1971, at the age

of 21. (Lorenzo Aff. ¶ 3.) She worked her way up the ranks in the Hospital's Women's Clinic

(which became the Department of Obstetrics and Gynecology ("OB/GYN Department" or the

"Department") sometime prior to 1987), from the position of Biller/Typist at her hire to

OB/GYN Account Supervisor, her current position, to which she was promoted in 1998. (*Id.* ¶¶

4-9.) She reported to Paul Orbe, the Assistant Administrator of the OB/GYN Department, and

his supervisor, James Buhager, the Executive Director of the OB/GYN Department, through

August of 2008.[1] (Buhager Decl. ¶¶ 3, 12.)

At the start of 2008, the year the alleged discrimination and retaliation occurred,

Lorenzo regularly attended meetings related to departmental finances with the administration of

the Department in her capacity as Account Supervisor. (Lorenzo Aff. ¶ 9.) She was also

responsible for all of the Department's accounting and bookkeeping, including maintaining

ledgers of all departmental transactions, computerized spreadsheet creation and bookkeeping,

maintaining current balance information for all special fund accounts, verifying faculty practice

plan transactions, processing deposits to the Department's special fund accounts, processing the

Department's accounts payable, monitoring the Department's purchasing and service

---

[1]    Lorenzo alleges discrimination only by Buhager. She does not allege that Orbe discriminated against her. (Lorenzo Dep. at 184.)

contracting, and any other accounting and bookkeeping her supervisors might assign her.[2]  (D. 56.1 ¶ 102[3]; *see* Lorenzo Dep. at 120-29.)  In her role as Account Supervisor, Lorenzo also supervised junior clerical staff.  (Lorenzo Aff. ¶ 9.)  Although she alleges that her job responsibilities have changed due to age discrimination and retaliation, her title has not changed and her salary has not been reduced.  (P. 56.1 ¶¶ 57-58.)

        2.     *Sara Crique Incident*

On April 10, 2008, Sara Crique, an administrator in the OB/GYN Department, entered the room where the Department's secretaries sat and, looking at the secretaries' name plates, exclaimed "What's the deal with all these immigrants with names ending in Ks?" (Lorenzo Aff. ¶ 18.)  Lorenzo and other employees in the Department deemed Crique's remark to be an ethnic slur.  (*Id.* ¶ 19.)  They reported it the next day to Orbe, who brought the matter to Buhager.  (Orbe Decl. ¶ 19.)  At a meeting with Lorenzo and the other complainants shortly after the incident was reported, Buhager insisted that there would be no repercussions or retaliation against them for bringing the complaint.  (Buhager Decl. ¶ 15; *see* Orbe Decl. ¶ 20.)  Janette Hicks, a Labor Relations Analyst from the Hospital's Department of Labor and Employee Relations ("Labor Department"), investigated the incident and met with each complainant. (Hicks Decl. ¶ 6.)  The Labor Department then arranged a meeting of Buhager, Crique, and the complainants, at which Crique apologized for her remarks.  (Buhager Decl. ¶ 17.)  Lorenzo did not attend that meeting because she was ill, but she apparently "did not find [Crique's] explanation credible and did not consider it a sincere apology."  (Lorenzo Aff. ¶ 19.)

---

[2]      According to the Hospital, these responsibilities were Lorenzo's during the entire time Orbe and Buhager were her supervisors.  Several of them have since been stripped from her by Jeff Singerman, Buhager's replacement.  (*See, e.g.*, Lorenzo Dep. at 122-123 (spreadsheets and ledgers).)  Lorenzo has not alleged any type of discrimination by Singerman.

[3]      I refer to the Hospital's Statement of Undisputed Facts, submitted pursuant to Fed. R. Civ. P. 56, as "D. 56.1 ¶ __."  The plaintiffs' Statement of Disputed Facts duplicates the Hospital's Rule 56.1 Statement, inserting same-numbered paragraphs where the plaintiffs believe an issue of fact is disputed.  For clarity, I refer to undisputed paragraphs as "P. 56.1 ¶ __" and denote disputed paragraphs inserted by plaintiffs as "P. 56.1 ¶ __-2."

On June 12, 2008, Lorenzo wrote to the president of the Hospital, Frank Cracolici, to inform him that she believed the Hospital was reacting improperly to the alleged ethnic slur. (Lorenzo Aff. ¶ 20.) On August 6, 2008 she received a response from Janet Connery, the head of the Labor Department, informing her that the Labor Department had determined that Crique's remark was not discriminatory and not intended to be offensive, and advising her that none of the other complainants had indicated that they had experienced any retaliation for raising their complaints (Connery Decl. ¶ 6).

3. *Alleged Adverse Employment Action*

a. *Move from Private Office to Open Cubicle*

At about the same time as Lorenzo's complaint to the Hospital's president, a new hire, Juan Montalvo, started work at the Department. There was insufficient space in the office to accommodate the new hire, and it was decided that Lorenzo would be asked to share her office. (Orbe Decl. ¶¶ 23-25, 35; *see* Buhager Decl. ¶ 20.) Orbe asked Lorenzo's coworkers Elaine Wu, Veronika Borovik, and Sabina Sujkovic to share with Lorenzo, but they declined. (*Id.* ¶ 26.) Therefore, Orbe assigned Montalvo to share Lorenzo's office. (Orbe Decl. ¶ 28.) Allegedly objecting to sharing her office with a male (Orbe Decl. ¶ 30), Lorenzo requested to share with one of her female coworkers; she was then told that she would either have to share an office with Montalvo or move to a cubicle at the front of the office. (*Id.* ¶ 31.) Lorenzo chose the latter option (*id.* ¶ 32; Buhager Decl. ¶ 20; *see* Orbe Decl. Exh. 5), and Sujkovic was moved to share Lorenzo's former office with Montalvo (Orbe Decl. ¶ 33).

Lorenzo protested the decision to move her to an open cubicle in a public area of the Department, and met with Buhager to complain. (Lorenzo Aff. ¶ 21.) She then met with Dr. Oded Langer, the Chairman of the Department, and inquired as to why she was being required to

move out of her office and not being permitted to share with one of her female assistants. Langer allegedly "chastised [her] for writing to the President Cracolici [sic] and alluded to [the June 12, 2008] letter as the reason that [she] was being removed from [her] office." (*Id.*)

        b.    *Alteration and Diminution of Job Responsibilities*

Lorenzo's job responsibilities began to change after her move to the front of the office. She was required to assist the secretaries, including answering the phone when no secretary was available, and was required to coordinate her lunch and vacation schedule with the secretaries so that there would be office coverage at all times. (Lorenzo Aff. ¶ 23.) Prior to her move she was not required to coordinate her schedule with the secretaries, and she was only required to answer phones on an emergency basis. (Lorenzo Dep. at 212; *see id.* at 217.)

After her move Lorenzo was also forbidden from moving her filing cabinets containing her accounting records to her new location. (Lorenzo Aff. ¶ 22.) Orbe and Buhager denied her request to move the cabinets, telling her that there was sufficient room for her files at her new cubicle and that there was no suitable location at the new cubicle for her filing cabinets. (Orbe Decl. ¶ 36; *see* Orbe Decl. Exh. 6.) When she attempted to move her cabinets anyway, she was made to return them to her old office. (Lorenzo Dep. at 108.) Without her filing cabinets, Lorenzo's accounting job was made more logistically difficult.

During the same period of time, Orbe and/or Buhager stopped assigning to Lorenzo various accounting and bookkeeping tasks that she had previously been asked to perform. Among the tasks that were stripped from her were such functions as reconciling departmental accounts, preparing monthly faculty practice plan reports and spreadsheets for the assistant vice-president of faculty practice, and ordering medical equipment. (Lorenzo Dep. at 124:17-127:17; *see* Lorenzo Aff. ¶ 25, P. 56.1 ¶ 118.) Buhager also requested that she switch

from Excel spreadsheets to Quickbooks to perform her accounting tasks. (Buhager Decl. ¶ 22.) For a period of time after the switch, technical problems with the new computer program prevented her from completing her assignments in a timely manner (Lorenzo Dep. at 57-58; *see* Lorenzo Aff. ¶ 16); a notation appeared in her annual review that she had problems with timely completing work (*see* Orbe Decl. Exh. 7). Finally, she was excluded from the departmental meetings that she had previously attended in her capacity as Accounts Supervisor. (Lorenzo Aff. ¶ 16.) Although she "continued to perform substantive accounting functions as her main job" (P. 56.1 ¶ 101), and "[n]o one else in the OB/GYN Administrative Department performs these functions" (*Id.* ¶ 100), by the time of her deposition on June 10, 2010, she was "relegated to data entry and answering the telephone" (P. 56.1 ¶ 129-2 (citing Lorenzo Dep. at 213)).

      c.    *Annual Review and Merit-Based Pay*

In July of 2008, Lorenzo received her annual review from Orbe. Orbe rated Lorenzo as "meets expectations" in her tasks, but noted that she did not complete accounting and bookkeeping tasks in time, had "numerous occurrences requiring her absence from work," and needed to "improve her communication with the administrative management team, in particular," Orbe himself. (Orbe Decl. Exh. 7.) In some but not all performance categories, her score of "meets expectations" was a diminution from the "exceeds expectations" scores she had received between 2002 and 2006. (Orbe Decl. ¶ 51; *see* Orbe Decl. Exh. 8-12.)

In August of 2008, the Department went through the process of assigning merit-based pay increases. Hospital administrators were asked to apportion merit-based increases according to a rubric known as the "Merit Increase Guidelines" (the "Guidelines") developed by the Hospital's Human Resources Department.[4] (Orbe Decl. ¶ 16.) Orbe and Buhager did not

---

[4]     *But see* P. 56 ¶ 141 ("Mr. Buhager did not follow any guidelines in denying Ms. Lorenzo a merit increase.").

grant Lorenzo a merit-based pay increase under the new rubric. (Lorenzo Aff. ¶ 23.) Orbe's and

Buhager's rationale for denying the increase echoed Lorenzo's negative performance evaluation

from the previous month: they cited her numerous absences from work, her communication

problems with the administration, and her trouble meeting work deadlines. (Orbe Decl. ¶ 17.)

Prior to the 2008 merit increase denial, she had consistently received merit increases. (Lorenzo

Aff. ¶ 24.)

B.    *Irene Rivera*

    1.    *Work History and Job Description*

        Irene Rivera, now 63 years old, began working for the Hospital in 1979. (Rivera

Aff. ¶ 3.) She left the Hospital's employ in 1985, but returned a year later. (*Id.* ¶¶ 4-5.) Like

Lorenzo, Rivera worked her way up through the ranks at the Hospital. (*Id.* ¶¶ 5-9.) In 2003

Rivera was promoted to the position of Medical Staff Coordinator in the administration section

of the OB/GYN Department, under the supervision of Orbe and Buhager.[5] (*See id.* ¶ 9.)

Although Rivera did not directly report to Crique, Crique was responsible for supervising the

Department's billing operations, and therefore Rivera and Crique had a "dotted line" reporting

relationship as well. (Crique Decl. ¶ 7.) Although the nature of Rivera's work has changed since

the beginning of 2008, the year in which she alleges the discrimination occurred, she has not

received either a diminution of salary or a demotion of title. (Orbe Decl. ¶ 14.)

    2.    *Performance Issues*

        a.    *Rivera's Credentialing Work*

        As Medical Staff Coordinator, Rivera was responsible for coordinating the

credentialing of the Department's clinical staff by the Hospital's insurance providers and by the

---

[5]    Rivera alleges that she suffered discrimination at the hands of both Orbe and Buhager. (Rivera
Dep. at 137.)

Hospital itself. (Rivera Aff. ¶ 9.) Rivera's job responsibilities included gathering the necessary credentialing information from physicians and midwives and forwarding the information to either the Hospital's Medical Staff Office, for the Hospital's internal credentialing process (done prior to the professional's start date), or insurance companies' managed care departments (done after the professional began work). (*See* Babic Decl. ¶¶ 4-5.) When necessary, Rivera was also responsible for following up with the professionals, the Hospital, or the insurance companies to ensure that the credentialing was timely completed. (*See* Orbe Decl. ¶ 6.)

In March of 2008, Rivera met with Crique about her credentialing work. Crique informed Rivera that the managed care credentialing (*i.e.*, the credentialing process that occurred after a physician or midwife began work at the Hospital) was taking too long. Crique told Rivera that she needed to be more proactive in contacting physicians and obtaining information necessary to expedite the credentialing process. (Crique Decl. ¶ 8; *see* Rivera Aff. ¶ 26.)

In April or May of 2008, Crique repeated her concerns about Rivera's performance in a meeting with Orbe and Buhager. She informed them that Rivera continued to have problems being proactive with her credentialing work, and that as a result the credentialing work was not being timely completed. (Crique Decl. ¶ 9.) When Orbe spoke to Rivera about these problems, suggesting that Rivera should proactively obtain medical documentation from doctors, Rivera responded "I'm not going to chase them around." (Orbe Decl. ¶ 6.) Rivera's May 12, 2008 performance evaluation documented her trouble with timely completing her credentialing responsibilities (Orbe Decl. ¶ 10; Orbe Decl. Exh. 2), echoing a 2006 performance evaluation that documented similar timeliness concerns. (*See* Orbe Decl. ¶ 8; Orbe Decl. Exh. 1.)

In April of 2008, a midwife began work in the Department without having been properly credentialed. When Orbe was informed of the oversight, he challenged Rivera, blaming her for not following proper procedure in credentialing the midwife. (Orbe Decl. ¶ 6.) He also made a note of the reprimand in a log he kept of Rivera's problems on the job. (*See* Orbe Decl. Exh. 3.)

b.     *Physician Database Updates*

Rivera was also responsible for maintaining an internal Department database of physicians and medical staff. On at least two occasions Orbe reprimanded Rivera about her database maintenance, stating that the database was out of date and that she needed to update it more frequently. Rivera declined to do so. (*See* Rivera Dep. at 175-76.)

c.     *Safeguarding Confidential Information*

As part of her credentialing and database maintenance responsibilities, Rivera was responsible for safeguarding the confidential information to which she was privy. On May 8, 2008, Orbe confronted Rivera about a set of confidential credentialing documents that she had allegedly left in a public bathroom. (Orbe Decl. ¶ 11.) He noted the incident in his log. (*See* Orbe Decl. Exh. 3.)

3.     *Alleged Adverse Employment Actions*

Rivera alleges that she was subjected to several adverse employment actions during 2008. First, her credentialing responsibilities were taken from her in June of 2008, and given to Dajana Babic, a 27-year-old coworker. (Compl. ¶ 28.) Instead of performing credentialing, which was a job performed by an experienced and senior member of the Department, she was relegated to secretarial duties, including filing and answering the telephone, previously carried out by departmental secretary Ewa Flak. (Rivera Aff. ¶ 21.) Buhager and

Orbe made the decision in late May 2008 to transfer the credentialing responsibilities to Babic because of Rivera's long-standing unsatisfactory performance. (Orbe Decl. ¶¶ 12-13.)

Second, Rivera received a negative performance review in May of 2008. The review incorporated many of the critiques noted above, and other criticisms were noted on her permanent employment file. Specifically, the review noted behavioral and performance issues including an alleged "lack of professionalism," failure to complete a credentialing project, and not completing Hospital-required competency trainings. (*See* Rivera Dep. Exh. J.)

Third, Rivera, like Lorenzo, was required to move from a private office to an open cubicle at the front of the Department. Before Babic took over Rivera's credentialing duties she served as Buhager's administrative assistant; thereafter, Babic moved to Rivera's desk and Flak became Buhager's administrative assistant. Flak moved to Babic's vacated desk, and Rivera was assigned to sit in Flak's former cubicle and perform secretarial tasks.

Finally, Rivera, again like Lorenzo, was denied a merit-based pay increase in August of 2008 due to her allegedly unsatisfactory performance. Orbe and Buhager allegedly determined pursuant to the Guidelines that Rivera was not eligible for an increase, describing her work as "not fully satisfactory" (Orbe Decl. ¶ 17 (punctuation omitted).) They described Rivera herself as a "non-performer because her output and quality of work was below standard." (*Id.* (punctuation omitted).) Rivera alleges that this determination was made because of invidious discrimination and age-related animus on the part of Orbe and Buhager and not according to the Guidelines.[6] (P. 56.1 ¶¶ 47-54-2.)

---

[6] The plaintiffs' application for relief with regard to the deposition of Paul Chadason is denied. At oral argument the Hospital indicated that Chadason would testify only, if at all, in order to authenticate the Guidelines. The plaintiffs' concerns regarding the fairness of such ministerial testimony are overblown.

C.    *The Current Action*

The current action, filed on May 29, 2009, asserts violations of both federal and New York State anti-discrimination laws. The complaint alleges that the Hospital discriminated against Lorenzo and Rivera on the basis of their advanced age, imposing adverse employment actions upon them for no other reason. The complaint further alleges that the Hospital retaliated against Lorenzo for complaining about Crique's remarks.

The Hospital moved for summary judgment, arguing that any employment actions taken against Lorenzo and Rivera were taken for legitimate business reasons. The plaintiffs opposed the motion, and I heard oral argument on January 25, 2011.

DISCUSSION

A.    *Standard for Summary Judgment*

Summary judgment may be granted where the evidence shows that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010). "A fact is material if it might affect the outcome of the suit under the governing law." *Id.* The moving party bears the burden of establishing that no genuine issue of material fact exists. *Baisch v. Gallina*, 346 F.3d 366, 371 (2d Cir. 2003). When applying this standard, I must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001).

B.    *Age Discrimination*

    1.    *The* McDonnell Douglas *Burden-Shifting Framework*

    Employment discrimination claims under the ADEA and NYSHRL are both subject to the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), for claims under Title VII. *Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) (ADEA); *Anderson v. Young & Rubicam*, 890 N.Y.S.2d 45 (N.Y. App. Div. 2009) (NYSHRL). First, the plaintiffs must establish a *prima facie* case of discrimination or retaliation. To make out a *prima facie* case of age discrimination under the ADEA a plaintiff must show "(1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination." *Gorzynski*, 596 F.3d at 107. This initial step is "*de minimis*," and not intended to be a difficult one for plaintiffs to surmount. *Woodman v. WWOR-TV*, 411 F.3d 69, 76 (2d Cir. 2005).

    Once the plaintiff has established a *prima facie* case of discrimination, the burden shifts to the defendant to prove "some legitimate, nondiscriminatory reason for its action." *McDonnell Douglas Corp.*, 411 U.S. at 802. Once it has done so, the burden shifts back to the plaintiff to prove that the defendant's proffered nondiscriminatory reason is pretextual and that the employer's adverse determination was "in fact" the result of illegal discrimination or retaliation. *Gorzynski*, 596 F.3d at 106. This third prong requires plaintiffs to prove that "age was the 'but-for' cause of the challenged adverse employment action." *Gross v. FBL Fin. Servs.*, 129 S. Ct. 2343, 2354 (2009).

2.      *Lorenzo*

   a.      Prima Facie *Case*

Lorenzo has shown that she is within the protected age group: she was 60 or 61 years old at the time when the events at issue occurred.  Her qualification to work as the accounting supervisor for the Department also does not seem to be in dispute.  (*See* D. 56.1 ¶¶ 100-102.)  I therefore find that Lorenzo has satisfied the first two elements of the *prima facie* case.

The actions allegedly taken against Lorenzo constitute a *prima facie* case for an adverse employment action under the ADEA.  She alleges that during the latter half of 2008, although she was still responsible for producing financial reports, she was "gradually stripped of all her accounting and bookkeeping functions."  During that same period, Buhager and Orbe "no longer provided her with information for preparing financial reports and she was not given access to electronic accounting system [sic].  She testified that she was no longer included in meetings regarding the department's finances."  (P. 56.1 ¶ 102-2.)  These allegations, although weakly supported in the record, satisfy the *de minimis prima facie* requirement.

At the fourth step of the *prima facie* case, Lorenzo has shown -- barely, but with sufficient evidence to meet a *de minimis* standard -- that the actions allegedly taken against her were taken under circumstances giving rise to an inference of discrimination.  She has admitted that the only individual who she believes discriminated against her was Buhager.[7]  (*See* P. 56.1 ¶ 60.)  Lorenzo has pointed to a pattern of hiring younger workers, a trend she attributes to Buhager.  She specifically cites the hiring of "only persons under forty" (Opp. at 26; *see id.* at 6

---

[7]      I note that Lorenzo alleged in her deposition that Orbe, while not actively discriminating against her, assisted Buhager in his discriminatory treatment.  (Lorenzo Dep. at 228 ("Mr. Orbe was following Buhager's advice, orders.  They were trying to push me out.").)  However, she admitted in her Statement of Disputed Facts (P. 56.1 ¶ 60) that the only person who discriminated against her was Buhager.  For the purpose of this opinion I rely on Lorenzo's Rule 56.1 Statement and her unequivocal testimony at page 184 of her deposition.

(listing eight new hires over four years, all younger than 37 and most in their mid-20s)). She also references another older employee, Maria Miah, who allegedly also suffered the same treatment as Lorenzo and Rivera. (Opp. at 26-27.) Such a trend is sufficient to support a *prima facie* inference of discrimination.

I find that there is evidence to support a *de minimis* inference of discrimination. I therefore hold that Lorenzo has satisfied the requirement to make a *prima facie* showing of discrimination.

    b.    *The Legitimate Nondiscriminatory Reason*

The Hospital has established a legitimate, nondiscriminatory reason for each action that Lorenzo alleges to have been an instance of discrimination. It has offered testimony that Lorenzo's office move was due to an office space restriction, and was not an attempt to gradually force Lorenzo to take on secretarial duties to the detriment of her accounting work.[8] (D. 56.1 ¶¶ 78-90.) The same is true for the Hospital's failure to move Lorenzo's filing cabinet; the Hospital offered testimony to prove that Lorenzo's files would have fit into the cabinets already available at her new workspace. (*Id.* ¶ 99.)

With regard to those of Lorenzo's core job responsibilities that were undisputedly taken from her, the Hospital has shown that these were not in fact taken away by Buhager. (*See* D. 56.1 ¶ 102; Mot. at 18-19; Lorenzo Dep. at 126-130.) Some responsibilities were taken from her by Buhager's predecessor or successor. (*See* Lorenzo Dep. at 126-130.) To the extent any such responsibilities were stripped from her by Buhager or Orbe, the Hospital has demonstrated that those responsibilities were not transferred to another worker but were either done by the supervisor himself or were automated. (*See id.* at 215-17.) The Hospital presents several

---

[8]    Whether this particular action was due to a motive of illegal retaliation against Lorenzo is another question. *See infra*.

legitimate and nondiscriminatory reasons for its decision to remove responsibilities such as creating Quickbooks reports from Lorenzo's list of responsibilities. Most importantly, the Hospital has shown that the majority of Lorenzo's accounting and bookkeeping responsibilities are still performed by her today. (*See id.* at 126-130.)

Further, with regard to the denial of her pay increase, the Hospital has shown that Lorenzo received a negative performance review in July 2008 that the Hospital alleges prevented her from being eligible for a merit-based increase. (Orbe Decl. ¶ 56.) A negative review may constitute a legitimate, nondiscriminatory reason for the denial of a merit-based pay raise.

c.    *Pretext*

Where an employer has provided a legitimate rationale for its allegedly discriminatory actions, "the presumption created by the *prima facie* case drops out," and the plaintiff must then "suppl[y] evidence from which a reasonable juror could conclude that the proffered reasons are not true reasons, but are mere pretext for the real discriminatory motivation." *Martinez-Santiago v. Zurich N. Am. Ins. Co.*, 2010 WL 184450, at *10 (S.D.N.Y. Jan. 20, 2010); *see Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 559-60 (2d Cir. 1997). Lorenzo cannot meet this burden.

i.    *No Discriminatory Intent*

Although Lorenzo's evidence satisfies the *de minimis* standard applicable to the prima facie case, it would not support a jury finding of discriminatory intent on the part of the Hospital. First, Lorenzo clearly alleges that the only individual who discriminated against her was Buhager (Lorenzo Dep. at 184) -- a man who was himself well within in the protected age category at the time of the alleged discrimination, and who is in fact only two years younger than Lorenzo. (D. 56.1 ¶ 8.) While not dispositive, "where the decision-makers are also in the

protected age group an inference may be drawn that there is no age-based animus." *Giordano v. Gerber Sci. Prods., Inc.*, 2000 WL 1838337, at *7 (D. Conn. Nov. 14, 2000). Second, Lorenzo has never heard Buhager make an ageist remark. (P. 56.1 ¶ 61.) Lorenzo has failed to present any evidence that Buhager would be motivated to discriminate on the basis of age, and therefore has not shown that Buhager's stated reasons for the allegedly negative employment actions were pretextual. Third, the Hospital noted in its responses to the plaintiffs' interrogatories (Seymour Decl. Exh. 6) that at least three OB/GYN Department employees aged 40 and older (Charlene Bellamy, age 49; Fern Williams, age 44; and Elaine Wu, age 43) were promoted during Buhager's tenure as Executive Director.[9] (*Id.* interrogatory 6.) Moreover, the plaintiffs themselves were both promoted to their current positions during Buhager's tenure -- Lorenzo in 1998 and Rivera in 2003. There is no evidence to support an inference that Buhager or the Hospital has engaged in a pattern of discrimination with regard to promotions.

Lorenzo also suggests that the Hospital's alleged actions against Miah might support an inference of discrimination against Lorenzo. (Opp. at 26-27.) Although Miah's job responsibilities seem to have shifted (*see* Miah Dep. at 43-44), the individual responsible for any discrimination that may have occurred in that situation was Miah's supervisor: Crique. (*Id.*) Indeed, Miah specifically stated that Buhager was not mentioned when she was informed of her altered job responsibilities. (*Id.* at 46.) Even if Miah were the the victim of age-based discrimination, Lorenzo has failed to establish that a rational jury could infer discrimination against Lorenzo based on the Hospital's treatment of Miah, where Lorenzo has expressly

---

[9]     In fact, Bellamy was hired at the age of 46, which indicates that Buhager's hiring choices were not tainted by invidious discrimination (Seymour Decl. Exh. 6, interrogatory 6), and shows the flaw in Lorenzo's argument that the Department hired nobody over the age of 40 between 2004 and 2008. (Opp. at 6.) Both Bellamy and Elaine Wu (who was also over 40 when she was hired) were hired during Buhager's tenure, albeit a few years earlier. (Seymour Decl. Exh. 6, interrogatory 6.)

admitted that only Buhager allegedly committed age discrimination against her (Lorenzo Dep. at 184).

Lorenzo also points to Buhager's decision to hire a series of workers in their mid-20s as evidence of Buhager's alleged intent to force out older workers. (*See* Opp. at 6, 26.) Although that hiring pattern may provide the *de minimis* level of evidence necessary to support an inference of discrimination for the purpose of the *prima facie* case, it does not bear up under the closer scrutiny inherent in the but-for inquiry. Lorenzo has provided no evidence other than the new hires' ages that the Department had begun a policy of systematically discriminating against older workers. Moreover, it appears the individuals who were hired were generally intended to supplement the Department's administrative staff. (*See* Rivera Aff. ¶¶ 13-19.) In other words, they were hired for junior positions, and not for the type of supervisory position held by Lorenzo. Hiring a series of younger workers for junior positions, without more, does not demonstrate age-based discrimination.

## 2.    *No Adverse Employment Effect*

To establish an adverse employment action under the ADEA, a plaintiff must demonstrate a "materially adverse change in the terms and conditions of employment." *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). "To be 'materially adverse' a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Id.* The key inquiry is whether the employer's action is "tantamount to a demotion." *Patrolmen's Benevolent Ass'n v. City of N.Y.*, 74 F. Supp. 2d 321, 335 (S.D.N.Y. 1999).

Lorenzo has not alleged an employment action that is "tantamount to a demotion." Although her allegation that her accounting duties have been gradually stripped from

her was enough to establish the *prima facie* case of discrimination, it could not support a jury

verdict at trial. During her deposition, Lorenzo was asked a series of questions about her current

job duties. She testified that she continued throughout Buhager's entire tenure to manage all

accounting and bookkeeping functions for the OB/GYN Department, maintaining ledgers of

transactions, computerized spreadsheets, and performing other bookkeeping tasks as assigned;

she also processed all accounts payable for the Department and all deposits to the Department

special fund accounts. (Lorenzo Dep. at 126-130; *see* P. 56.1 ¶ 102.) These are clearly

accounting and bookkeeping responsibilities, rather than secretarial work. Lorenzo testified that

these accounting and bookkeeping functions took up more than her normal work day and that she

worked overtime frequently to keep up with her accounting responsibilities. (Lorenzo Dep. at

75-80.)

 Lorenzo could not identify any job duty that was transferred to another worker by

Buhager that bore on her core duties as an accounting and bookkeeping supervisor. In fact, she

admitted that the jobs she performed at the start of 2008 (or had performed in the past) were

either still performed by her or had been eliminated altogether. (*See* P. 56.1 ¶ 100.) Several of

the more substantive duties that have been transferred to other employees were taken away by

either Buhager's predecessor, Orna David, or his successor, Jeffrey Singerman. For example,

David transferred Lorenzo's payroll duties to another worker sometime prior to 2006. (D. 56.1 ¶

108; Lorenzo Dep. at 128.). Singerman eliminated Lorenzo's recording and spreadsheet-creating

duties. (Lorenzo Dep. at 126, 223.) These transfers cannot support a charge that Buhager

illegally discriminated against Lorenzo.

 Further, the jobs undisputedly taken from Lorenzo by Buhager -- ordering office

and medical supplies -- were transferred to other workers at the Hospital whose job titles

reflected the more menial nature of the transferred tasks. Other responsibilities allegedly stripped from Lorenzo during the period of time at issue, such as reconciling departmental accounts, are no longer done by any employee (Lorenzo Dep. at 235-36), or were never done by Lorenzo in the first place (*id.* at 234-35 (check requests)). These transfers do not support a charge of discrimination. *See Libront v. Columbus McKinnon Corp.*, 832 F. Supp. 597, 627 (W.D.N.Y. 1993) (where older employee's job functions were absorbed by younger employees who were not newly hired or transferred, or where functions were eliminated through changes in policies or implementation of automation, there was no pretext). The evidence presented by Lorenzo with regard to her job responsibilities cannot prove that she experienced a gradual stripping of her accounting and bookkeeping work that caused her to be relegated to a secretarial position.

Lorenzo does allege that she was excluded from financial meetings, that information she required for her job was withheld from her, and that she was given "less and less accounting work." (Lorenzo Aff. ¶ 16.) However, as noted above, it seems from Lorenzo's own testimony that accounting in the Department was becoming more automated and required less human intervention (Lorenzo Dep. at 234-36); her testimony strongly suggests that the change in her accounting work was not motivated by age-based animus but by Buhager's and Orbe's efforts to modernize the Department.[10] By her own testimony she cannot prove that "but for" age-based animus she would have been permitted to continue attending meetings and performing specific accounting duties.

---

[10] Although Lorenzo alleges that she was "not given access" to the office's electronic accounting system, her deposition testimony clarifies that the lack of access was due to technical issues on the part of the office's computer staff, and therefore does not support Lorenzo's complaint of discrimination. (Lorenzo Dep. at 57-59.)

Lorenzo's other allegations also fail to support her argument that she experienced materially adverse employment effects. Her move from a private office to an open cubicle -- even with the added receptionist duties and her inability to move her filing cabinet -- constitutes a mere inconvenience not actionable under *Galabya*. Although the move meant that Lorenzo added some receptionist duties to her job description, it appears from her testimony that her accounting and supervisory duties were not materially affected by the increased secretarial responsibilities. (Lorenzo Dep. at 75-80.)

The negative review of Lorenzo in July of 2008 is similarly unavailing. Her review noted that "one area requiring improvement is her attendance." (Lorenzo Dep. at 142-43.) It also noted that she needed to "maintain and improve her communication with the administrative management team, in particular the assistant administrator," Orbe. (*Id.*) At her deposition, Lorenzo admitted to having had "numerous occasions requiring her absence from work" -- one of Buhager's main comments in his negative review. (*Id.*; *see* P. 56.1 ¶ 133). Although she experienced an adverse effect from this performance review in the form of the denial of a merit-based raise, the stated reasons for the denial included at least one reason (her absences) that in her deposition she admitted was legitimate. Therefore, even assuming *arguendo* that the review's allegation of poor communication was a pretext hiding discrimination, the pretextual reason was not the "but for" reason for the denial of merit pay.[11]

I conclude that Lorenzo has failed to put forth evidence sufficient to support a jury finding of a material adverse effect on her employment or that her supervisor possessed the intent to discriminate on the basis of her age. Lorenzo's age discrimination claims under the ADEA and NYSHRL are therefore dismissed.

---

[11] The fact that Lorenzo was forbidden to bring her granddaughter to work with her is far from the type of career-impacting discriminatory actions envisioned by *Galabya*, and cannot form an independent basis for a denial of summary judgment.

3.    *Rivera*

a.    Prima Facie *Case*

Rivera easily satisfies the first element of the *prima facie* case, as she was 59 years old when her credentialing duties were stripped.  She also satisfies the second element, as she had performed those duties for the previous five years (P. 56.1 ¶ 4-2) and had consistently received mixed-to-positive reviews of her performance (*see* D. 56.1 ¶ 19; P. 56.1 ¶¶ 19-2, 25-2).  Third, the removal of her credentialing duties is an adverse employment action -- a functional demotion that stripped her of the main duty of her job.  Fourth, the adverse action occurred in a context that can give rise to an inference of age-based animus: Rivera was effectively demoted by a supervisor who was only 40 years old at the time of the demotion (D. 56.1 ¶ 7), and who had previously made comments to her about the timing of her retirement.  (Rivera Dep. at 78-81, 318.)  A jury could infer from Orbe's age and his statements regarding Rivera's retirement that he acted out of age-based animus in stripping her of her credentialing duties.

b.    *The Legitimate Non-Discriminatory Reason*

The Hospital explains its decision to strip Rivera of her credentialing duties and its failure to award her a merit-based pay increase as based on her inadequate performance on the job.  Specifically, the Hospital alleges that Rivera had for several years been slow at performing her credentialing responsibilities (D. 56.1 ¶¶ 19, 25; *see* Crique Decl. ¶ 8); that a midwife began working at the hospital without the proper credentials (D. 56.1 ¶ 27); that Rivera was insufficiently proactive with regard to physician credentialing (*id.* ¶ 29); that she left confidential information in the bathroom (*id.* ¶ 35); and that she consistently failed to keep the OB/GYN medical and departmental staff database up to date, disregarding requests from Orbe to increase the frequency of her updates (*id.* ¶¶ 31-32).  Rivera's performance reviews reflect the Hospital's

criticisms (D. 56.1 ¶¶ 19, 36; *see also* Orbe Decl. ¶¶ 6-13), as do Rivera's own admissions (P. 56.1 ¶¶ 25-2, 32). I conclude that the Hospital has provided a legitimate, nondiscriminatory business rationale justifying its decision to strip Rivera of her credentialing duties. (*See* Orbe Decl. ¶ 12-13 ("In June 2008 [Buhager and I] decided that, due to Ms. Rivera's ongoing poor performance, especially in the area of physician credentialing, her credentialing responsibilities would be given to another employee . . . . The decision to transfer Ms. Rivera's credentialing duties . . . was based solely on Ms. Rivera's poor job performance.").)

        c.    *Pretext*

According to both the Hospital and Rivera, Rivera's performance record in her credentialing duties demonstrates a consistent pattern of slowness, inefficiency, and reprimands. As early as 2006 Rivera received a negative performance evaluation from Orbe in which he wrote that "in the area of managed care, [Rivera] needs to anticipate the need for information to expedite credentialing a physician." (Kahn Decl. Exh. C, Rivera Dep. Exh. G.) That negative review essentially foreshadowed Orbe's and Crique's comments two years later on Rivera's failure to be proactive in her credentialing duties. (*See* Orbe Decl. ¶ 6 ("Ms. Rivera consistently showed problems in the area of credentialing physicians"), ¶ 10 (Rivera's willingness to be more proactive in credentialing physicians "remain[ed] lacking" in 2008); Crique Decl. ¶ 8 ("In or about March 2008, I told Rivera that the managed care credentialing was taking too long and that she needed to be more proactive . . . .").) It also matches Orbe's written documentation of Rivera's occupational deficiencies (D. 56.1 ¶ 36). Furthermore, Rivera admitted at her deposition that Crique told her in March 2008 that she needed to be more proactive in her credentialing duties. (Rivera Dep. 163-64.) The level of consistency between reports, both across time and across individuals, strongly suggests that the criticism of Rivera's performance

in 2008 that led to her effective demotion was not pretextual.  (*See* Orbe Decl. at ¶¶ 12-13; Crique Decl. at ¶ 8).

Rivera alleges that Langer's testimony that he was not aware of any problems she was having with credentialing demonstrates that the credentialing issue is pretextual.  (Opp. at 20-21.)  But the mere fact that nobody informed Langer of Rivera's inefficiency at credentialing does not establish pretext.  (*See* P. 56.1 ¶ 29-2.)  Langer was the OB/GYN Department head, at least two levels of supervision removed from Rivera.  It is not improbable or improper that Buhager would not have informed him of this staffing issue.  Indeed, Langer testified at his deposition that he was not required to be consulted on the sort of staffing issue that resulted in Rivera being stripped of her credentialing duties.  (*See* Langer Dep. at 64.)

Because the evidence provided by the Hospital is consistent and reasonable, and because Rivera has brought forward no evidence other than speculation that the Hospital acted pretextually in taking the alleged adverse employment actions, I dismiss Rivera's ADEA and NYSHRL claims.[12]

## C.     *Retaliation*

Lorenzo also brings a retaliation claim under § 2000e-3 of Title VII and the NYSHRL,[13] arguing that she suffered illegal retaliation for reporting Crique's statement and the OB/GYN Department's allegedly insufficient response to Cracolici.  This section of Title VII "forbids retaliation by employers against employees who report workplace race or gender

---

[12]     I do not discuss the incidents in which Rivera allegedly left confidential information in the bathroom, allowed a midwife to begin work without procuring the proper credentialing information, or was reprimanded for her inefficiency at maintaining the departmental database, because I find that Rivera's pattern of poor performance at her core duties of credentialing hospital medical staff was sufficient to justify the Hospital's removal of those duties.  However, these problems further illustrate that Rivera did not adequately perform her credentialing job.  She has not presented any evidence to indicate that they were merely a pretext for age-based discrimination.

[13]     NYSHRL retaliation claims are analyzed in the same manner as Title VII retaliation claims.  *See Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006) ("[R]etaliation claims under the NYSHRL are generally governed by the same standards as federal claims under Title VII.").

discrimination." *Crawford v. Metro. Gov't of Nashville and Davidson Cty., Tenn.*, 129 S. Ct. 846, 849 (2009); *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1041 (2d Cir. 1993).  An action under this section of Title VII is also evaluated under the *McDonnell Douglas* framework. *See Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1178 (2d Cir. 1996).

      1.    *The* Prima Facie *Case*

      To make out a *prima facie* case of retaliation a plaintiff must show (1) that she participated in the "protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).

      There is no real dispute as to the first and second prongs of the *prima facie* case. Lorenzo undisputedly complained about Crique's allegedly discriminatory statements not only to Labor Relations but also to the president of the Hospital.  (D. 56.1 ¶ 73.)  This is clearly protected activity.  *See* 42 U.S.C. § 2000e-3(a).  It is also undisputed that the Hospital was well aware of Lorenzo's complaint.  (*See* D. 56.1 ¶¶ 65-73.)

      Lorenzo also satisfies the third prong of the *prima facie* case.  An employment decision is adverse for the purpose of a retaliation claim when it "well might have dissuaded a reasonable worker from making or supporting a [discrimination] charge." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (punctuation omitted); *see Thompson v. N. Am. Stainless, LP*, 131 S. Ct. 863, 868 (2011).  The mere fact of Lorenzo's relocation from a private office to an open cubicle setup meets the standard set by *Burlington Northern*.  A private office is a valuable commodity, and a jury could reasonably conclude that the knowledge that one could lose one's private office by making a complaint could easily dissuade a worker from making or

supporting a discrimination charge. Moreover, the move had adverse effects on Lorenzo's job responsibilities and her conditions of employment: she must now answer the phone several times each day, where previously she had phone-answering responsibilities only as a matter of last resort (Lorenzo Dep. at 302-303); she must coordinate her work and vacation schedule with the receptionists to ensure phone coverage at the office (Lorenzo Decl. ¶ 23); and she must presumably walk back to her former office each time she needs to access her accounting files. Although not styled a demotion, the combined effect of these changes could support a finding of a materially adverse employment action.[14]

Finally, Lorenzo's testimony about the statements made to her by Langer satisfies the causation prong of the *prima facie* test with regard to the office move. The close timing of the complaint and the negative review/denial of merit pay also provides a strong inference of a causal connection between the two. *See Gordon*, 232 F.3d at 117 ("proof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment . . .; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant"). I find that Lorenzo has made a *prima facie* showing that her work environment, job responsibilities, and conditions of employment were adversely altered after she complained about Crique's alleged behavior.

2.    *The Legitimate Nonretaliatory Reason*

The legitimate nonretaliatory reason alleged by the Hospital for Lorenzo's move is the hire of Montalvo and the associated office space requirement. As noted above, the

---

[14]    This case demonstrates that the same action -- office relocation -- may support a retaliation claim but not an ADEA claim -- a result consistent with Supreme Court precedent. *See, e.g., Thompson*, 131 S. Ct. at 868 (standard for adverse employment decision is lower for retaliation claim than for substantive discrimination under Title VII). While a retaliatory office move may, even if done in part for some legitimate reason, chill the reporting of discrimination, such a move is not the type of career-impacting change that would constitute age-based discrimination. *See Galabya*, 202 F.3d at 641 (an office transfer is adverse for ADEA purposes "only if it results in a change of responsibilities so significant as to constitute a setback to the plaintiff's career").

Hospital argues that it attempted to convince several female administrative personnel to move into Lorenzo's office but was rebuffed by each individual. The Hospital further argues that it did not force Lorenzo to move, but instead gave her a choice between sharing her office with Montalvo and moving to the cubicle. On their face, these space constraints appear to be a legitimate and nonretaliatory reason to require Lorenzo to share her office.

Lorenzo's negative performance evaluation and the Hospital's decision to deny her merit pay, to the extent they are implicated in the retaliation claim, also appear to bear legitimate and nonretaliatory rationales. The negative performance evaluation was apparently given in the normal course of employee development and supervision, and it included negative items that even Lorenzo agrees were correct (*e.g.*, her poor attendance record, *see supra*). The denial of a merit increase proceeded from the negative performance evaluation according to a matrix used to evaluate all employees. (*See* D. 56.1 ¶ 141.)

      3.    *Pretext*

A rational jury could find that the Hospital's legitimate and nonretaliatory rationales are pretextual. Lorenzo alleges that when Dr. Langer "explain[ed] the Department's decision to deny her request to share her office with a female employee and instead relocate her to the reception area," he "had a copy of [her letter to Cracolici] with him . . . and alluded to it." (Opp. at 28; Lorenzo Decl. ¶ 23; *see* Lorenzo Dep. at 226-27.)[15] Lorenzo's testimony, if believed, could support a finding by a reasonable jury that the asserted rationale governing the decision to place Montalvo in Lorenzo's office, rather than assign him to another cubicle in the open front area or locate him in the cubicle being vacated by Flak, was a pretext meant to hide an

---

[15] The Hospital alleges that Lorenzo did not send the letter until the day after she was assigned to the reception area, but Lorenzo testified that she sent the letter on the same day as the meeting with Buhager. The timing of the letter and the meeting is thus a disputed issue of material fact to be decided by a jury. Moreover, the meeting with Langer was on June 24, almost two weeks after both the office move and the sending of the letter.

illegal act of retaliation.[16]  Although the Hospital claims it gave Lorenzo a choice of whether or not to move, a jury could find that she was in fact forced to choose one of two untenable options. Further, the missed pay raise and the negative performance evaluation could easily be found to be pretextual given their timing.

I conclude that a rational jury could find from the evidence presented by Lorenzo that the Hospital's proffered reasons are pretextual and that her office move was an act of illegal retaliation.  I therefore deny summary judgment on the Title VII retaliation claim.[17]

## CONCLUSION

The plaintiffs' age discrimination claims are dismissed.  Summary judgment on Lorenzo's claims of retaliation is denied.

So ordered.

John Gleeson, U.S.D.J.

Dated: September 8, 2011
       Brooklyn, New York

---

[16]      The Hospital argues that, because the other four women who complained about Crique's comment do not allege retaliation, a jury could not reasonably infer that the Hospital retaliated against Lorenzo for her complaint.  However, Lorenzo alleges that it was her decision to write to the president of the Hospital -- an escalation that was not pursued by any of the other complainants -- that led to Buhager's retaliatory actions.

[17]      To the extent the Hospital alleges that it would have pursued the same course of action against Lorenzo in the absence of any retaliatory motive, thereby invoking the mixed-motives test of *Price Waterhouse v. Hopkins* rather than the pretext test of *McDonnell Douglas*, I would deny summary judgment under that test as well. *See Price Waterhouse*, 490 U.S. 228 (1989), *superseded in part on other grounds by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1074; *Raskin v. Wyatt Co.*, 125 F.3d 55, 60 (2d Cir. 1997).  Under *Price Waterhouse* a plaintiff must first show that "an impermissible criterion was in fact a 'motivating' or 'substantial' factor in the employment decision." *de la Cruz v. N.Y. City Human Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 23 (2d Cir. 1996).  If the plaintiff makes such a showing, the defendant must then prove it would have subjected the employee to the same adverse conduct even if retaliation had not been considered in its decision. *See Price Waterhouse*, 490 U.S. at 272.  Lorenzo has satisfied the first prong of the *Price Waterhouse* test with, *inter alia*, evidence that Langer alluded to her complaint to Cracolici when moving her to the front office cubicle.  A reasonable jury could conclude that Langer's reference to Lorenzo's complaint demonstrates that retaliation was a motivating or substantial factor in the move and that the Hospital's proffered reason for its action -- overcrowding in the Department's administration section -- would have been insufficient in the absence of an additional desire to retaliate against her for the complaint.